I'll call the case of Matthew Thompson v. B. Smith and others. May it please the court. My name is Chad Dunn and I, along with Armand Durfner, represent Matthew Thompson, the appellant in this case. According to a jury, Mr. Thompson, while housed at the Liberty Correctional Institute in the state of Florida, was retaliated against by guards for exercising his First Amendment right to grieve for better prison conditions. This retaliation included taking Mr. Thompson's legal papers. To this day, they haven't been returned. And the jury found that Mr. Thompson was subjected to an unconstitutional spraying of O.C. spray, pepper spray or poison gas. The district court on motions for new trial issued an order finding that the behavior of the defendants and the constitutional violations in this case were egregious. Despite this, Mr. Thompson is yet without a remedy to the serious constitutional violations that he suffered. The district court would not permit the jury to award personal injury damages or compensatory damages or punitive damages. The district court also read the Prison Litigation Reform Act to limit Mr. Thompson's attorney's fees to $15, or 150 percent of the $10 nominal damages the jury was permitted to award. The district court also did not award litigation expenses for the trial. And finally, the district court denied Mr. Thompson an injunction to search for and report on the ultimate location and disposition, if any, of his legal records. Those four issues are presented in this case, and ultimately what Mr. Thompson is here pleading with you is to provide him a meaningful remedy for an egregious constitutional violation. I'll start first with the injury question. There is no court in this country that has, in a reported decision, whether binding or persuasive, found that injuries such as these are not compensable. There is one circuit case from Judge Boggs' home circuit, the Sixth Circuit, called Jennings v. Mitchell. It was decided in 2004, and it seems that that case has set many a judge on an errant path in this regard. In Jennings v. Mitchell, in a five- or six-paragraph opinion, a pro se, unrepresented prisoner went before the court complaining of a spraying that he faced. There are no facts described in the opinion. And in that case, in one sentence, the court says that it finds that the spraying of O.C. spray was de minimis. It's an unpublished opinion. From that point forward, a number of other district courts have relied upon that case and lately on each other to conclude that the spraying with a poison gas is, in fact, not an injury under the Prison Litigation Reform Act. But this court also has some decisions that are of import here. The first is the Danley case. And in the Danley case, this court considered a number of challenges by a number of prisoners to prison conditions, and one of those was the spraying of O.C. spray. And what the court found is that it didn't cause a permanent injury. But nevertheless, the court described at length the types of pain and anguish, the types of injury that an inmate goes through when they're faced with being sprayed with O.C. It's not fair, though, to say that that case resolves the question. The issue in that case was whether or not O.C. spray could be used constitutionally under any circumstances. But this court's rationale for justifying the use of that spray is helpful. Because the court's rationale is that the spray is to be used in place of more lethal or perhaps more harmful force. So if there is a justification for beating, for example, or shooting with a service weapon, the idea is that O.C. spray can be used to avoid those outcomes. It is a less of an injury, no doubt, but it is not de minimis. And this court has three opinions that essentially try to lay out what is de minimis. The standard that this court has adopted to determine under the Prison Litigation Reform Act whether an injury is compensable is it has to be more than de minimis, but it need not be significant. The three cases, the first one is unreported. It's called Dixon v. Toole. It seems to collect a number of cases. On that case, this court said requiring an inmate to sleep on a concrete bunker is not a injury that is compensable. In fact, it's de minimis, according to the court. The next case is Harris v. Garner. In that case, an inmate was required to shave without shaving cream or water, running water. This court said that that was a de minimis injury that's not compensable. And then finally, there's a Fourth Amendment case, but it gets cited in a lot of these Eighth Amendment cases, called Nolan v. Isbell. This one is a reported case. In that case, an individual in the course of being arrested was pushed around, shoved, suffered some bruises, and this court said that that was a de minimis injury. Counsel, let me ask you this. Would it be fair or would it be an appropriate judgment to say that not every pepper spray is more than de minimis, but that some might be, and that the proper standard would be that at least sometimes, if the evidence is adequate, it ought to go to the jury? I found, with the assistance of my learned clerks, instructions in a case involving Profit Paulson, P-A-U-L-C-I-N, which that's exactly what the judge did, is that he instructed the jury that they should find whether or not the particular events amounted to more than de minimis, but less than significant. Would that be an appropriate way to go at this? Yes. In fact, it's our position that this should be handled in the normal course and be left as a fact question for the jury to resolve, which is what we asked for in this case. And I'll give the court an example that perhaps fits within Judge Boggs' question. For example, inmates, and this happens regularly, there's cases on this, inmates will be in a cell with another inmate who has done what is necessary to be deserving, I suppose, of this spray. They spray the inmate that is disruptive or disobedient, and some of the spray gets on the other individual who's in the cell. Now, in that case, it's not an unconstitutional spraying. The injury to the other person was incremental or incidental to an authorized spraying elsewhere, and the injuries are light. Often they just involve a drop or two or perhaps a little bit of excess gas. In that case, the jury ought to be able to determine, assuming there's sufficient summary judgment evidence, that there was, in fact, no injury. And if the jury determines, based upon hearing all the evidence, that there was an injury and that it was an unconstitutional spraying, this court can still review any damages awarded reasonably. And in this case, counsel, if you can assist me, as opposed to a, quote, conventional or one spray incapacitation, the best argument I saw for you is they sprayed him twice, they forced him to shower, and there's some cases that say showers are good. He obviously thought it wasn't, and they forced him to shower, and they didn't clean up the cell to the extent that when he was put back, another prisoner complained and tried to clean it up. Is that kind of a fair statement of your strongest points of why this is an extraordinary pepper spray? It is, but there's two other missing elements, one of which is he was left in the cell after having been sprayed for somewhere between 30 and 45 minutes, which we don't know because the clocks weren't synced. And also, in terms of the shower, he's not complaining about having to shower. He had protected himself because he'd been warned by the guards they were going to teach him a lesson. And so the only thing he got sprayed with was his hands and his face. And you see on the video that when he showers, he leans in to just wash those areas because he was told that if they run into your groin and armpit, they'll burn substantially. And the guard forced him to strip. Yeah, that's what I meant about the forced showering. Given that I have three minutes left, I'd like to move on and talk about the fee issue for a moment. There are three basic reasons that the district court was in error for limiting the attorney's fees to 150 percent of $10 or $15. The first is that no court in this nation has said that the Congress' statute explicitly limits attorney's fees. Now, every court, though, to be fair, that has looked at this, other circuits, have found that there's a limitation of 150 percent on attorney's fees. But they use language like the Sixth Circuit, for example, in the Vane cases, the statute's not a model of clarity. The first court says, we're going to have to figure out the important essence of it. Judge Hinkle, in this case, said it was awkwardly drafted. The Third and the Eighth Circuits found it similar. And what is significant about these cases is that they were trying to determine what Congress' intent was. But in three newer cases, cases that come from the U.S. Supreme Court since all these circuit decisions, the U.S. Supreme Court has spoken more clearly about these issues. And I want to point out, just to make it clear, there is no binding precedent in this court, and there's no other panel opinion at the Eleventh Circuit on this issue. But no court has said that the statute specifically limits these attorney's fees. And the U.S. Supreme Court, in the Murphy case that came from last term, says that you read the statute literally, regardless of the result. And in the Epic Systems v. Lewis case, also from last term, the Supreme Court, it says that the court is to give effect to all of the statutes that apply. And in this case, the standard 42 U.S.C. 1988 attorney's fee statute in civil rights cases applies in equal force with the statute that the district court appointed here. But in another case that unfortunately didn't make it into the briefing, is called Max v. General Revenue Corporation, it's at 568 U.S. 371, it's a 2013 case by Justice Thomas. In that case, what the Supreme Court was faced with was the argument that a statute under the Fair Debt Collection Practices Act required that attorney's fees and costs could only be awarded if there was a finding of bad faith. And in that case, the Supreme Court said the statute doesn't say that. It doesn't say only if. And just as here, the statute doesn't say you may only be given 150% of your judgment for attorney's fees. So in the final 30 seconds, I'd like to just mention the other two. I mean, it would sort of be a weird result, though, if we construed it the way you're suggesting, wouldn't it? I don't believe so. The statute, the exact language says... I mean, wouldn't it render part of the statute superfluous? That's exactly why I bring up the Max opinion, because it talks about superfluous, and it says if Congress didn't word the statute and it renders parts superfluous, so be it.  I see my time's expired. I'd like to reserve the other two issues on our brief. All right. Thank you. Good morning, Your Honors. Eric Avern on behalf of the Corrections Officers of Hallease in this case. Turning to the first issue in this case... Do you know where Mr. Thompson's legal papers are? No. I mean, was there any effort to find them? The evidence in this case suggesting the legal papers revolves around testimony from Price and Thompson, okay? So the testimony at trial was that Thompson was called from the law library to Center Gate where he met Price. Yeah, no. I'm familiar with that. I just want to know, I mean, have you looked for them? Where are they? I mean, he's entitled to his legal papers. You agree? He would be, but the problem is that he never sued for the return of them. There's never been an allegation in this case the defendants have had to defend against related to the return of those papers. I just, so, I mean, what happened to them? You just... I don't know. There's a discrepancy about whether or not the legal papers were returned to him. Judge Hinkle pointed out at one point during one of the hearings at trial that it appeared that there were legal papers in Mr. Thompson's cell. Mr. Thompson says that those are different legal papers. The officer said that they were the same legal papers. They believe they were the same ones. I don't know, that officers do not know what happened to it because... But the jury found that they had retaliated against him by taking his legal papers and by spraying him. No, not spraying, Your Honor. The retaliation for the legal papers happened a couple of days prior to the spraying. I know, but wasn't that... Okay. Wasn't the spraying also in retaliation for the grievances? No. There was no finding by the jury that said that. What the finding was, was that he was sprayed in violation of the Eighth Amendment in, based on cruel and unusual punishment. Not a retaliation claim. The verdict form doesn't say that. But it only would have been, it only would have been a violation of the Eighth Amendment if they were doing it for improper purposes, which would have been what he had alleged, which was in retaliation for his grievances. Am I missing something here? There was... The only claims for retaliation for filing grievances, based on the verdict form, based on everything that's been presented throughout the pendency of the entire case, as well as the jury instructions, was the taking of the papers by price. The retaliation claim is only against price and cites. It's not against Gough or Sykes for the use of force at a later date. Right. But the Eighth Amendment claim alleges that the reason he was sprayed was because he was filing grievances against them. Am I... Maybe I'm confused. You can help me with this. The facts, the facts didn't present that. The facts presented that he was, he was placed in confinement. While he was placed in, prior to being placed in confinement, he was, the legal papers were left at the officer station. That's the take. That was the retaliation. Okay. But let's focus for a moment on the O.C. spraying. Yes. Was there or was there not evidence that the reason he was sprayed was in retaliation for his grievances against the officers? I don't believe there was any testimony related to that. I would need to review the record again, but I don't believe there was any testimony from even the plaintiff related to he was sprayed because of grievances. What happened... Well, didn't the officers say, we're going to teach you a lesson? I mean, according to the testimony, what lesson were they going to teach him? I thought it was that they were trying to protect the officers from grievances. I mean, that's what I understood the record, but I may have misunderstood. Good. The, I'm going to teach him a lesson was a statement that alleged by Mr. Thompson that the officer said. The officers at trial said they never said that statement. Right. But we have to look at the evidence in the light most favorable to the jury verdict, don't we? Right. But, and the plaintiff, the... So wouldn't that be in the light most favorable to the jury verdict? I mean, I don't see how they could have returned a verdict on cruel and unusual punishment or deliberative or deliberate indifference or whatever it was, a violation of the Eighth Amendment. They couldn't have returned a verdict for OC spraying unless it was done sadistically and maliciously. I mean, if it had been done in response to some kind of behavioral problem, they would have been well within their rights, wouldn't they? That's correct. And that's what the... So can we agree then that in order for the jury to have returned this verdict, they must have believed the testimony that he was sprayed in order to teach him a lesson for filing grievances? Yes. Okay. That would have had to have been the only way that they could interpret that statement. That is correct, Your Honor. The problem is that the retaliation claim and the Eighth Amendment claim are not intermixed in that they involve different sets of officers on a different day. Am I right, counsel, that the jury verdict form says, number one, were Thompson's legal papers taken in retaliation for his filing of grievances, and then question five is, was Thompson unlawfully sprayed with chemical agents? So we'd have to go, that is, it doesn't say retaliation there. It was unlawful because it was excessive force, because it was cruel and unusual, et cetera. Correct. Correct.  I'm not sure which way that cuts, if any, because if the pepper spraying was more than de minimis, then we ought to reverse, right? Yes, but it wasn't. Well, and the question here is, is it your position that no pepper spray can ever be more than de minimis? No, and I was going to ask— The question I put to the other side was, isn't there some range in which it could, in fact, be more than de minimis or not, and it's a question of fact. And that was one of the questions that I was going to answer, Your Honor. It was the very first thing I wrote down and that I was going to answer. No, it is not the appellee's position here today that a spraying with chemical agents under any circumstance is necessarily de minimis. There is going to be a range of factors that interplay in that. Some of the factors include the degree of injury. The degree of injury in this particular case was consistent with what would normally be associated with pepper spray. Mr. Thompson testified that the degree of injury that he suffered was immediate loss of breath, he said he was fine, and then he took a shower and he experienced burning. That's de minimis. That is the definition of a de minimis injury within this Circuit's rulings on previous cases. So you're not traveling on this permanent, non-permanent theory? No. I'm using exactly what Mr. Thompson testified at trial was the degree of injury. You acknowledge, as I guess we all must, that the PLRA just says physical injury. The statute doesn't say it has to be permanent physical injury. That's absolutely correct, and it would not be the appellee's position that that would be the case. But pepper spray has been acknowledged by Danley, as cited by opposing counsel, as being an alternative form of controlling inmates, which is nonlethal in manner. That's not to say that pepper spray could not rise to the level of a greater-than-de minimis injury. There have been circumstances where that has happened, where the score is down. Well, there's a Fourth Circuit case where the inmate died. Yes. Yes. And so that would be the case. Let's say hypothetically, let's say hypothetically that an inmate has a breathing condition that would be exacerbated by the use of chemical agents to the point that they died. Some type of severe asthma, COPD, something along those lines. That could rise to a level greater-than-de minimis. Well, I mean, surely the inmate doesn't have to die before you say this is more than de minimis. Of course not. But let's say that they, that's an extreme example. Let's say that they suffer some type, some type of degree of injury where they would have to suffer or where they would have to receive extensive medical treatment or not even extensive, some degree of medical treatment. This Court has cited to a case in an appendix case prior to where it's out of the Fifth Circuit. It's a Federal, it's a Federal supplement case. So it's a district court case, but it's Luong. In that case, the Court stated that if it would be something, would the injury require or not require a free world person to visit an emergency room or have a doctor attend to give an opinion, diagnosis and or medical treatment for the injury? In effect, would home treatment suffice? In this case, we have shortness of breath immediately there, immediately happening. Mr. Thompson, by his own testimony, being fine, and then a shower. But you, I mean, those are all fact questions, right? I mean, you're not saying judges ought to be making those decisions. Well, let's see. Would this require treatment in an emergency room? Of course not. But when looking at, when looking at a. Of course not, meaning it should go to a jury. No, it should, it should be, it should be based on what the plaintiff is saying the injuries were. Well, his statements about, particularly after the showering, about how he felt, certainly as I read it, would be something that I might want to go see a doctor about. About the burning? Yeah. It was temporary in nature. He said it lasted maybe two to three days at most. Wait, wait, wait, wait, wait, wait. First day, I might want to go to the doctor. Depends on how hypochondrial you are, but if I had burning in my certain areas, I might want to see a doctor. Especially for two or three days, I mean, that's a long time. That's what, that's what he stated. But you've already agreed with me that it's not a permanent versus non-permanent standard. That's correct. You've acknowledged that's not in the statute, that's not the analysis. Correct. So whether it's lasting or not is not. It's one of the factors that should be implementable and whether something is de minimis, though. It's not the end all, be all. It definitely should not be that. So you're saying, for example, let's just take an extreme example. He gets sprayed, he showers, they have him shower within 30 seconds of his being sprayed and the shower works miracles and he never feels any pain, right? Yes. Okay. That's in contrast to he gets sprayed, he sits around in a cell and covered in OC spray. Then he goes to take, to shower off the parts that are covered and then they make him do the rest of his body so he'll be covered more. Then he goes back to a cell and sits in that cell for another few days while the cell is still covered in OC spray. I mean, where do you draw the line and how do you make that decision? There was, there was, okay. The returning to the cell, though a relevant factor, was not a separate distinction made by the jury. It was a relevant factor in whether there was excessive force, that is correct. But Hinkle went, Judge Hinkle went to great lengths when brought up by opposing counsel during the course of the trial to amend in a new claim related to the cleaning issue to say that that was not properly preserved or brought before the court. There is no determination in the verdict form or otherwise in the jury instructions related to the cleaning of the cell. There was testimony from the officers that they did clean the cell. Yes, it's relevant to the determination of whether it was excessive force, but it's not, it wasn't in itself a separate claim related to the issue. Turning to, turning to the second issue related to attorney's fees. There are three problems with the way that, with the interpretation presented by the appellant. The first problem is it would render the second sentence entirely meaningless. Because the way that the appellant, the way that the appellees understand the appellant's argument is, is that Judge Hinkle could have awarded an award greater than 150 percent of the judgment. But the problem is, is that in doing so, who pays? Because the PLRA statute, the second sentence, specifically ties the amount of 150 percent to the defendants. If any, an extreme reading of that would be that the defendants wouldn't be responsible for anything. That's an extreme reading. A more practical reading, as adopted by ten circuits, the appellants or the appellees referenced three of those circuits, but all ten circuits that have touched this case thus far have put in a practical cap of 150 percent of the judgment itself. The only circuits to not touch this, from my understanding in a review of the case law, is this circuit, the Federal Circuit, and the D.C. Circuit. And the reason for those circuits is that the language, if the award of attorney's fees is not greater than 150 percent, the excess shall be paid by the defendant, implies that if it is greater than 150 percent, then the defendants don't have to pay. Yes. It's a negative pregnant excuse. Yes, exactly. Expresio uneus. Exactly. That would be an extreme reading of it, and that would be what it is. So the practical reading of it would be exactly what Judge Boggs stated. Though it was stated in a dissent, Justice Sotomayor has also stated that there may be a 150 percent cap in the most recent case interpreting the two sentences at issue. So with all of that said, the defendants would state that the plaintiff stated only suffered a minimus injury in this case, and which was decided on summary judgment. And though the defendants did not go into great detail about it, the plaintiff waived such arguments later on, and that the reading of the statute should be, as interpreted by Judge Hinkle, was appropriate in this case. Thank you. May it please the Court. I'll begin, if acceptable, with Judge Martin's question about what is the disposition of these legal papers. The reality is we don't know. The guards testified at trial. They didn't know what happened to them. And because the injunction request was denied, they were never made to go search for them and make a report to the court of their ultimate disposition. I do want to point out on the injunction claim, Judge Hinkle had two reasons to deny it. The first is he claimed that Mr. Thompson didn't properly plead it because he didn't use the word injunction in a part of his complaint. But Mr. Thompson asked in numerous different filings, including his complaint, for the return of his papers. We cite these in our brief. But also the district court found that because he was no longer at the Liberty Correctional Institute, that somehow or another injunctive relief was moot. And there are some cases that say when you're being abused by guards and you're moved to a new facility, you don't get an injunction against those guards. But this is a different matter altogether. And the State has no cases, Judge Hinkle cited no cases, saying that that type of relief is moot. I focus on this injunction issue because the court wouldn't need to reach the attorney's issue if it finds that there was a legal error made by Judge Hinkle in denying the injunction and remanded the case for the entry of an injunction, trying to discover the disposition and at least report on it. We're always looking for help in how to write these opinions. So assuming that we found that there was more, at least there's a jury question about whether it should be limited by this no physical injury problem that Judge Hinkle identified. I mean, then the case would go back, right? It would. I mean, ultimately, the attorney's fees issue, I suppose, can be butted for another day. We've got to decide that anyway, don't we? Well. I believe that you do. Do we have to decide it though?  If the attorney determines that there is more than a de minimis injury, then the issue never arises a second time. And shouldn't we wait until the issue actually arises to decide it? I've been convinced. That would be a more efficient use of judgment. They might give you a $100,000 compensatory. You'd have $150,000 and that more than covers all your time. That's exactly right. So the issue could be reserved. And again, as I mentioned, if the injunction. We got that settled. There are cases that say if injunctive relief is granted, the 150% doesn't apply at all. The final issue I want to return to is this de minimis issue. And Mr. Cavern and I are just going to have to respectfully disagree about the testimony about Mr. Thompson's injury. It was extensive. It was, as was mentioned, over a number of days. But ultimately, that's sort of the problem with the disposition here is that Mr. Cavern and I are arguing a jury case before you on the nature of Mr. Thompson's damages. You keep saying Mr. Thompson said he was fine. Is that your reading of the record? No, that is not my understanding. In fact, he says in his sworn complaint, he talks about burning. And then he testifies he was burnt when he got sprayed. What I think he's referencing is that later the nurse wrote down in some note that he had no injury. And perhaps that's what Mr. Cavern references. But Mr. Thompson, evidently the jury didn't believe that. Mr. Thompson testified at length about the various injuries that he faced. And ultimately, he was, in fact, treated by a medical professional. That's what I understand about the government's argument here. Well, if you have to go get treated, then maybe that's the threshold question for an injury. But in this case, he was taken to a nurse and received treatment. Well, I thought they said that for that, that the prison protocol said if you spray somebody, then you have to take them to the nurse. That's true. But Mr. Thompson, nevertheless, was seeking the treatment. You know, I'll just say in closing, Churchill was right. You decide the quality of a community based upon how they treat their prisoners. The character of this country is based upon certain rights applying to all, even prisoners. In every other context, this would be compensable. And it should be here. The district court should be reversed. Thank you. Thank you so much. We're going to proceed to our insurance case next. But we're going to take a five-minute break before we do. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Good morning. You can be seated.